BRIAN J. STRETCH (CABN 163973)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

CLAUDIA A. QUIROZ (CABN 254419)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
FAX: (415) 436-7234
claudia.quiroz@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH EDWARD CONNER<br><br>Defendant. | Case No. CR-15-00296-HSG<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Date: April 10, 2017<br>Time: 2:00 p.m.<br>Court: Hon. Haywood S. Gilliam, Jr. |

## I. INTRODUCTION

The defendant, Joseph Edward Conner, stands before the Court to be sentenced after pleading guilty to Counts One through Three of the captioned Indictment charging him with violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) – Distribution and Possession of Methamphetamine with Intent to Distribute (Counts One and Two); and 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) – Possession of Methamphetamine with Intent to Distribute (Count Three). The Court has set April 12, 2016, at 2:00 p.m. as the date for judgment and sentencing. The defendant has pleaded guilty pursuant to a plea agreement. The government submits the following sentencing memorandum in order to advise the Court of its Sentencing Guidelines calculation and its sentencing recommendation.

The government agrees with United States Probation Office's total offense level calculation of 34 and that the defendant's criminal history category is I, resulting in a Guidelines Range of 151 to 188 months. *See* Presentence Report ("PSR") ¶¶ 25, 30. The government disagrees with the Probation Office's sentencing recommendation of 97 months in custody, however. The government recommends a sentence at the low-end of the Sentencing Guidelines Range of 151 months in custody. In addition, the government concurs with the U.S. Probation Officer's recommendation of a three-year term of supervised release, to follow the defendant's custodial sentence and a special assessment of $100. Finally, the government requests that the defendant be subject to a suspicionless search condition as agreed upon by the parties.

## II. THE DEFENDANT'S OFFENSE CONDUCT AND RELEVANT CONDUCT

The offense conduct is sufficiently set forth in the PSR. PSR ¶¶ 5-11; Plea Agreement ¶ 2. In summary, DEA agents engaged in the following three controlled purchases of methamphetamine from Conner: (1) on August 22, 2014, Conner sold 187.3 grams of 99% methamphetamine (185.6 grams of actual methamphetamine) to a DEA undercover agent ("UCA") in exchange for $3,000; (2) on November 6, 2014, Conner sold 448.8 grams of 99.5% methamphetamine (446.5 grams of actual methamphetamine) to the UCA in exchange for $5,400; and (3) on December 16, 2014, Conner possessed with intent to distribute and attempted to distribute approximately three pounds (1,317 grams of 97.5 % pure methamphetamine (1,284 grams of actual methamphetamine)) of suspected

methamphetamine to the UCA in exchange for $4,800 for each of the three pounds ($14,400 total). The total amount of methamphetamine involved in these three transactions was approximately 1,916.1 grams (1.9 kilograms) of actual methamphetamine.

## III. SENTENCING GUIDELINES CALCULATIONS

The government concurs with the PSR's Guidelines calculation which results in a total offense level of 34.[1] The government also agrees that the defendant's criminal history category is I, resulting in a Guidelines range of 151 to 188 months.

## IV. DISCUSSION

### A. Applicable Law

Title 18, United States Code, section 3553(a) directs courts to consider a number of factors in determining an appropriate sentence. *See United States v. Booker*, 543 U.S. 220 (2005). In this case, these factors indicate that a sentence of 151 months is sufficient, but not greater than necessary, to achieve the goals of sentencing. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The key factors include the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1); the sentencing goals (including reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, affording adequate deterrence to criminal conduct, protecting the public from further crimes by the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner), § 3553(a)(2); and the kinds of sentences available, § 3553(a)(3).

Although the Supreme Court's decision in *Booker* has rendered the Sentencing Guidelines advisory, the Guidelines still remain the "starting point and initial bench-mark" for sentencing. *Kimbrough v. United States*, 552 U.S. 85, 108, (2007) (internal quotation marks and citation omitted); *see Carty*, 520 F.3d at 991 (en banc); *United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011). While there is no presumption of reasonableness for a Guidelines range sentence, if a district judge "decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure

---

[1] The government does not move for an additional point for acceptance of responsibility under U.S.S.G. § 3E1.1(b).

that the justification is sufficiently compelling to support the degree of the variance." *Carty*, 520 F.3d at 991-992 (citing *Gall v. United States*, 552 U.S. 38, 50, (2007)); *see also United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 (9th Cir. 2011) ("district court must start with the recommended Guidelines sentence, adjust upward or downward from that point, and justify the extent of the departure from the Guidelines sentence."). As the Supreme Court recognized in *Gall*, "a major departure should be supported by a more significant justification than a minor one." 552 U.S. at 50. Finally, "[a]s a general rule, the preponderance of the evidence standard is the appropriate standard for factual findings used for sentencing." *United States v. Armstead*, 552 F.3d 769, 777-78 (9th Cir. 2008); *see, e.g.*, *United States v. Treadwell*, 593 F.3d 990, 1001 (9th Cir. 2010).

### B. Sentencing the Defendant to a Sentence at the Low End of the Guidelines Range Would Vindicate the Interests Set Forth in 18 U.S.C. § 3553(a).

#### 1. Nature of Circumstances of the Offense.

First, with respect to the nature and circumstances of the offense, the defendant's conduct has been taken into account in calculating the applicable offense level. 18 U.S.C. § 3553(a)(1).

#### 2. History and Characteristics of the Defendant.

The history and characteristics of the defendant are partially summarized in the PSR. Unlike many defendants, Conner was fortunate to have been raised with a supportive family and parents who "provided for him and cared for him well." PSR ¶ 36. In addition, he does not appear to have had any experiences involving abuse or traumatic events during his upbringing." PSR ¶ 37. He has the luxury to be able to spend much of his free time with his children, as well as on his hobbies that include "working on automobiles." *Id.* He also has the support of his spouse, to whom he has been married for approximately sixteen years. PSR ¶ 38. With respect to finances, he and his wife have enjoyed steady employment with sufficient income to support their family and entertain hobbies. *Id.* Specifically, Conner had a steady job for approximately a decade and earned approximately $100,000 per year. PSR ¶ 44. Conner and his family own a home, which was a gift from his parents 18 years ago. PSR ¶ 39. Based on this background, Conner's actions appear to have been motivated by greed.

/ / /

**3. Sentencing Goals**

The government is sensitive to the fact that Conner has some minor health issues and may need medical care. As set forth herein and in the attached declaration of Dr. Peikar (filed under seal), however, the Federal Bureau of Prisons ("BOP") will be able to provide the medical treatment he needs while in custody.

According to the Legal Resource Guide to the BOP, "[e]very institution maintains a Health Services Unit to provide medical, dental, and mental health care." U.S. Department of Justice, Legal Resource Guide to the Federal Bureau of Prisons at 25-26 (2014).[2] "Service is provided by a variety of health care professionals, including psychiatrists, physicians, nurses, physician assistants, dieticians, dentists, and pharmacists. . . . [c]ommunity medical professionals are consulted as needed, and inmates are sent to community hospitals should medically necessary care be unavailable at the institution." *Id.* The Legal Resource Guide further provides as follows:

> In making determinations regarding the appropriate institution in which to house an offender, the [United States Department of Justice, Federal Bureau of Prisons ("BOP")] carefully considers the offender's health status. As the BOP provides extensive medical services, *a defendant's medical condition generally will not preclude a sentence to BOP custody*. When serious health concerns are an issue in a designation decision, the [Designation and Sentence Computation Center (DSCC)] will refer the case to the BOP's Office of Medical Designations and Transportation (OMDT). A specific institution is designated with attention to the urgency of medical need; institution capability; current bed space availability; and security concerns.
>
> . . .
>
> Each inmate is assigned a medical "Care Level," based on his or her medical history as described in the Presentence Report and other available information. The BOP's goal in implementing the Care Level system is to assign inmates with greater medical needs to those facilities with more comprehensive on-site medical resources, and to provide more effective and efficient access to health care for each inmate.

*Id.* (emphasis added).

[2] *Available at* https://www.bop.gov/resources/pdfs/legal_guide.pdf (last visited April 3, 2017).

The government provided to the BOP all of the medical records received from Conner's counsel and related medical information in the PSR so that a BOP physician could review that information and provide an opinion on the BOP's ability to provide care for the defendant in custody. In response, the government received the Declaration of Dr. Nader Peikar, the Chief Medical Officer for the BOP at the Federal Correctional Complex ("FCC") at Victorville, CA. The government is filing that declaration under seal. *See* Exhibit A in Support of United States' Sentencing Memorandum. As the Chief Medical Officer at FCC Victorville, Dr. Peikar is responsible for overseeing delivery of medical care at the institution and advising other FCC Victorville physicians in the management of especially difficult or complicated cases. Exhibit A ¶¶ 2-3. Dr. Peikar reviewed the description of the defendant's medical conditions as set forth in the PSR along with the 182 pages of medical records provided by the defendant.[3] *Id.* ¶ 4. Dr. Peikar is familiar with the defendant's conditions described therein. *Id.*

As set forth in Dr. Peikar's declaration, the BOP's professional health services staff provides essential medical, dental, and mental health (psychiatric) services in a correctional environment. *Id.* ¶ 9. The BOP uses licensed and credentialed health care providers in its ambulatory care units, which are supported by community consultants and specialists. *Id.* For inmates with chronic or acute medical conditions, the BOP operates several medical referral centers ("MRCs") providing advanced care. *Id.* (citations omitted.) The BOP has significant experience providing health care for patients with a wide variety of chronic medical and psychiatric conditions. *Id.* ¶¶ 10-11. In addition to BOP physicians and other health care staff, consultants, including psychiatrists, psychologists, cardiologists, dentists, and orthopedists are available to provide any specialized care that might be required for Conner. *Id.* ¶ 11. The BOP also has contractual arrangements with hospitals in the local community. *Id.* Should Conner be sentenced to a term of imprisonment, the BOP's Medical Designation Unit would evaluate his medical condition upon receipt of his designation information and would ultimately determine the most appropriate BOP facility for accommodating his medical needs given the medical resources of the BOP. *Id.* ¶ 13.

---

[3] A summary of the defendant's medical conditions are set forth in the sealed declaration and not repeated here to protect the defendant's privacy. *See* Exhibit A ¶¶ 5-6.

Based on the information provided, Dr. Peikar concluded that "Conner's conditions would not interfere with the BOP's ability to provide him appropriate placement and medical care at the conclusion of his physical therapy program." *Id.* ¶ 8. According to Dr. Peikar, "[t]he BOP routinely houses inmates with the defendant's conditions, and management of these conditions is considered a normal part of the health services function." *Id.* In summary, it is Dr. Peikar's "opinion that the BOP can provide appropriate medical care for Mr. Conner at either a Level I or II institution . . . ." *Id.* Because "Conner's conditions would not interfere with the BOP's ability to provide him appropriate placement and medical care at the conclusion of his physical therapy program," the Court should not impose a lower sentence than it otherwise would if Conner did not suffer from such medical conditions. *See id.*

The government disagrees with Probation that a downward departure is warranted in this case and posits that a sentence within the Guidelines is fair, reasonable, and sufficient—but not greater than necessary—to achieve the goals of sentencing. The amount of methamphetamine in this case was substantial. Moreover, this offense was motivated by greed—Conner had a stable upbringing, steady employment, a home, and a supportive family. It is for these reasons and those set forth below that the government disagrees with Probation's recommendation of 97 months in custody—a four level departure from the Guidelines range. In support of its recommendation, Probation cites the fact that Conner has never spent time in custody prior to this case, compliance with his pretrial release conditions, a stable upbringing, steady employment, his care for his children, his health problems, and the financial toll this offense will have on him and his family. Sentencing Recommendation at 2.

First, Conner engaged in multiple—not just one—controlled purchases of significant quantities of a dangerous and destructive drug. Methamphetamine is potent and highly addictive. "The consequences of methamphetamine abuse are terrible for the individual—psychologically, medically, and socially." Nat'l Inst. on Drug Abuse, "Methamphetamine Abuse and Addiction," Nat'l Inst. of Heath Pub. 13-4210 (rev. Sept. 2013) at 1.[4] Methamphetamine can cause memory loss, aggression, psychotic behavior, cardiovascular damage, malnutrition and severe dental problems from the dry mouth

[4] This report is available at https://www.drugabuse.gov/publications/research-reports/methamphetamine/letter-director, and the tabs associated with it (last visited April 3, 2017).

and bruxism that commonly accompany its use. *Id.* "Beyond its devastating effects on individual health, methamphetamine abuse threatens whole communities, causing new waves of crime, unemployment, child neglect or abuse and other social ills," including increased transmission of infectious diseases, such as hepatitis and HIV/AIDS. *Id.* Though meth use is on the decline nationally, it remains a significant problem in Northern California. For the first half of 2012, methamphetamine ranked second in drug-related treatment admissions in San Francisco emergency rooms. *Id.* at 2. The enormous costs of methamphetamine use—estimated at $23.4 billion nationally in 2005—are apparent every day in every Superior Court in this District. Though drug dealing is often viewed as a victimless crime[5]—or at least one where the victims' injuries are self-inflicted[6]—it is a crime with enormous human costs. The quantity that Conner distributed to the UCA was the equivalent of approximately 383,220 doses.[7]

Second, Conner's own statements to the UCA regarding his knowledge about the methamphetamine and how to obtain it—including the quality of the drugs—demonstrate that this behavior was not an anomaly:

> Conner told the UCA that *all that "shit"* (the UCA believed this to be a reference to methamphetamine) *is guaranteed and if it is "not right"* (the UCA believed this to be a reference to the quality of the methamphetamine), *we'll replace "it"* (the methamphetamine purchased by the UCA). Conner stated that *he knows the "main dudes"* (a reference to Conner's sources of supply for methamphetamine) and that *they know the cartels where "it"* (the UCA believed this to be a reference to the methamphetamine) comes from. When the UCA was discussing future methamphetamine transactions with Conner, Conner noted that he usually needs a day ahead of time (the UCA believed this to mean to acquire a methamphetamine order). Conner added that if it's enough (a reference to a larger methamphetamine order), it has to be brought up and takes two to three days. Conner stated that *"it's all quality"* (high quality

---

[5] The PSR notes that "[t]his is a Title 21 offense and there is no identifiable victim." PSR ¶ 12. While it is true that the government has not identified any specific victims in this case, the PSR's statement should not be understood to mean that there are no victims because drug dealing is a victimless crime.

[6] Although it is difficult to understand how someone would choose the miserable and uncertain life of a drug addict, the hardship itself, and the difficulties people face in ending their addictions, indicate that it is not a choice made free of compulsion.

[7] One dose of methamphetamine is typically 5 mg. U.S.S.G. Commentary 9 to ¶ 2D1.1. Conner distributed or attempted to distribute approximately 1,916.1 grams, which is equivalent to 1,916,100 milligrams. This is equivalent to 383,220 doses. Even if the dose were calculated as 10 mg, this would still amount to approximately 191,610 doses.

> methamphetamine) and that *"they"* (Conner's methamphetamine suppliers) *won't even fuck with it (methamphetamine) unless it's top shit* (top quality).

*See* PSR ¶ 7 (emphasis added).

Third, with respect to his stable upbringing and steady employment history, these are indicators that this offense was motivated by greed and not by need. By engaging in this crime, Conner has put himself and his family at risk and participated in the distribution of an extremely addictive and dangerous drug that continues to plague our society.

Fourth, with respect to his health problems, as discussed above and in the declaration of Dr. Peikar, Conner's conditions would not interfere with the BOP's ability to provide him appropriate placement and care and should therefore not be a factor warranting a below-guidelines sentence.

Finally, with respect to Conner's children, the government is sensitive to the fact that a long prison sentence will have an impact on his children. However, Conner's children are not the only one impacted by this offense. Indeed, children are especially vulnerable and susceptible to the production and distribution of methamphetamine in society. Child endangerment is a critical issue in dealing with methamphetamine use and production.[8]

---

[8] *See, e.g.* Dana Hunt, Ph.D.; Sarah Kuck; Linda Truitt, *Methamphetamine Use: Lessons Learned,* National Institute of Justice Office of Justice Programs ¶ 3.1.2 (February 2006), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/209730.pdf (last visited April 3, 3017):

> Data from the Office of National Drug Control Policy report that children are present at over 10% of all methamphetamine related incidents (lab seizures, accidents) in the United States. Of the over 14,000 incidents in 2003, almost 1,300 involved children being exposed to toxic chemicals and over 700 resulted in the removal of the child to protective custody (http:/www.whitehousedrugpolicy.gov). Raiding a meth lab involves a number of law enforcement and other public safety officials (fire services, HAZMAT teams). Too often, however, the responding team finds it is in need of child welfare specialists, social services and trained medical staff to test children on the site for exposure. In 2003, ONDCP and the Department of Justice's Office of Community Oriented Policing Services began developing Drug Endangered Children initiatives to assist states with the coordination of their efforts on behalf of children. As a consequence, a number of states have introduced guidelines for addressing the presence of children as well as created additional penalties for child endangerment for the manufacturer who exposes children to the drug or its precursors.

## V. CONCLUSION

In full consideration of the defendant's history and characteristics together with the goals of sentencing, the government respectfully requests that the Court sentence the defendant to a within-Guidelines sentence of 151 months in prison. The government recommends that this term in custody be followed by three years of supervised release, the search condition agreed upon by the parties, a $100 special assessment, and forfeiture as set forth in the plea agreement.

Respectfully submitted,

DATED: April 3, 2017

BRIAN J. STRETCH
United States Attorney

/s/
CLAUDIA A. QUIROZ
Assistant United States Attorney